## Borough of Birmingham *versus* Anderson.

*Town Plot, presumption of Authenticity of.—Proceedings to perpetuate Testimony, what Notice required to validate.—Deceased Surveyor, declarations of, when evidence.*

1. Where a plan, corresponding with the description of lots and streets in cotemporaneous and subsequent conveyances, but without any mark of authenticity, was placed in the recorder's office, and remained there for fifty years, the presumption is it was placed there by the owner of the property.

2. In proceedings instituted by a borough to perpetuate testimony in relation to its streets, highways or landings, notice by publication, in pursuance of an order of the court, is sufficient to entitle the testimony to be read in any judicial proceeding relating to the subject-matter thereof between the borough and any of its inhabitants or property-holders.

3. The declarations of a deceased surveyor relative to lines run and plans made from actual survey in such a case, are evidence, though not made under oath.

ERROR to the District Court of *Allegheny county.*

This was an action by Elizabeth Anderson, against the Authorities of the Borough of Birmingham, to recover damages for the appropriation of ground alleged to be hers, for the purposes of a public landing. The cause arose under the provisions of an Act of Assembly, passed April 19th 1858, entitled "An Act establishing a Public Wharf or Landing in the Borough of Birmingham, in the county of Allegheny," of which the following is an abstract:

The first section declares the *locus in quo* to be a public landing, authorizes the taking of tolls, &c., and makes it the duty of the borough authorities to grade and improve the same, and to keep it in repair.

The second section provides for the appointment of viewers to assess damages, alleged to have been sustained by reason of the appropriation of the land.

The third section provides an appeal from the report of the viewers, which "shall take grade with and be proceeded in, as to questions of title, damages, and general merits, and in all other respects whatsoever, as original actions brought in said court."

Section fourth provides that security be given for payment of damages, &c., which are to be paid within one year after they shall be ascertained and adjusted.

The borough of Birmingham is built on the south bank of the Monongahela river, nearly opposite Pittsburgh. The plan of the town was laid out in 1811, by Dr. Bedford. He was at that time owner in fee of 75 acres of land, part of the Ormsby Villa Survey. The town is located on the north-western corner of this tract.

The original paper on which Dr. Bedford's plan was delineated, was not produced on the trial, the same having long since been lost or mislaid; but a record in the office of the recorder of

[Borough of Birmingham *v.* Anderson.]

deeds of the county of Allegheny was produced, entitled "A plan of the town of Birmingham." This paper is on page 412 of Deed Book R, vol. 17, and is without date; but was found among the records made December 14th 1811. Several years since, the plan was cut out of vol. 17, and transferred to "Plan Book," vol. 1, where it is still to be found. The name of Dr. Bedford does not appear on this plan; but it was shown on the trial that it was laid out on the northern end of his purchase from John Ormsby; that as early as November 16th 1811, he commenced selling lots in what he calls in his deeds, "the general plan of the town of Birmingham;" and continued until a short time previous to his death in 1818, during which time he disposed of all the lots in the town (107 in number), except a few sold at sheriff's sale; that the lots sold by him, as well as those sold by the sheriff as his property, in location, size, and number, correspond with those marked on this plan; that there is the same correspondence as to the names, width, and courses, of the streets and alleys, and as to the public square called "Bedford Square," in the recorded plan, and which is now and has always been called by that name; and that the whole town is laid out on the ground in exact accordance with the recorded map or plan; that the lot-holders and corporate authorities had always recognised this plan. No witness was produced who had ever heard of the existence of any other. On the recorded map between the outer line of the river lots and the river, is delineated a space of ground called "beach of the river," "or Water street," the words "or Water street," being written in a different handwriting and ink from the body of the paper.

On the 28th of May 1856, the burgess and town council of the borough of Birmingham, by virtue of powers vested in them to lay out and open streets, by Act of Assembly passed the 8th day of April, A. D. 1848, passed an ordinance laying out Water street, on the beach of the river, and fixing the width of the street at forty feet, and directing the same to be opened. The street was opened in 1856 and 1857, and no damages were claimed by any of the lot-holders. The part of the beach lying between Water street and the river, was declared to be a public landing or wharf, by the Act of 19th April 1858. On the 5th of June 1858, Mrs. Elizabeth Anderson presented her petition to the District Court, averring that she had sustained damages by reason of the appropriation of the *locus in quo,* and viewers were appointed, who reported that no damages were sustained by the petitioner. On the 29th of July 1858, an appeal was taken to the District Court. The plaintiff below claimed title to a part of the beach of the river thus appropriated, and exhibited her petition for damages, under the provisions of the Act of Assembly above recited. To show title, she gave in evidence

[Borough of Birmingham *v.* Anderson.]

a deed from Dr. Bedford to Patrick McKeag, dated 2d of January 1812, conveying " five certain lots or pieces of ground, situate in the town of Birmingham, on the south side of the Monongahela river, in St. Clair township, Allegheny county, marked in the general plan of said town, Nos. 48, 55, 63, 71, and 105; said lots 49, 55, 63, and 71, lying contiguous to each other, and bounded by Denman street, Virgin alley, Grosvenor street, and the Monongahela river." She then proved that she was the sole surviving heir at law of William McKeag, devisee of said Patrick McKeag (the said William having died intestate, and without issue), and after some evidence on the question of damages, rested. Defendants claimed, first, that the beach of the river (including the *locus in quo*), if Dr. Bedford ever had any title to it, had been dedicated by him to public use, to be used as a street; and that plaintiff's ancestor took subject to the public easement. Second, that the *locus in quo* was not included in the Ormsby Villa survey, but was within the manor of Pittsburgh, which was surveyed on the 27th day of March 1767, and was the private property of the late Proprietaries of Pennsylvania.

The ground appropriated and claimed by the plaintiff below, is a low, sand flat, between high and low water mark, and is entirely submerged by a six feet stage of water.

On the trial defendant offered in evidence a plan of the town of Birmingham, in Plan Book, vol. 1, page 4, taken from Deed Book, vol. 17, page 412, the said plan being cut out of said Deed Book, between pages 411 and 414, in connection with the testimony of John O'Hern, taken in pursuance of a bill to perpetuate his testimony in No. 108 March Term 1847, of the Court of Common Pleas of Allegheny County, with further evidence that said plan has been a recognised plan of the town of Birmingham for fifty years, for the purpose of showing that the *locus in quo* was never a part of plaintiff's property, and to show that the same was dedicated to public use, and that if plaintiff had any right therein, it was subject to the public easement.

The offer was objected to by plaintiff for the reasons:—

1. That the proceedings in No. 108 March Term 1847, were *ex parte.*

2. That the plan is not acknowledged.

3. That the plan offered is a copy, and not the original.

4. That it does not purport to be Bedford's plan, and is not referred to in his deeds.

5. That the plan appears to be interpolated in a material respect, viz. " or Water street," being in black ink.

6. That the plan is inconsistent with the deed of Bedford under which plaintiff held, and did not charge McKeag with con-

structive notice of dedication, even if in the recorder's office at the time of his purchase.

The objections were sustained, and the offer rejected. This constituted the first assignment of error.

The plan was again offered in connection with the evidence of Nath. Patterson, a surveyor, who testified that he had seen the plan about thirty years ago in the recorder's office; that about ten years before it had been transferred to the Plan Book; that it corresponded with the town as laid out on the ground; that he had lived in Birmingham for many years, and was the Recording Regulator of the town, and had never heard of the existence of any other plan; that the original he had never seen, although diligent search had been made for it, and the plan offered had always been the recognised plan of the town. This offer was made for the purpose of showing, that the *locus in quo* was a street or highway to be held in connection with the navigable stream known as the Monongahela river, dedicated by the owner, Dr. Bedford. The plaintiff objected to the offer, for the reasons before stated. The court sustained the objections, and rejected the evidence, which was the subject of the second bill of exceptions.

The defendants' counsel requested the court to charge,

1. If the jury believe that the ground appropriated by the defendants in this case for a wharf, is inside of the manor line of the manor of Pittsburgh, then the patent to Ormsby, and the *mesne* conveyances to the ancestor of the plaintiff, conferred upon her no title.

2. If the court should affirm proposition No. 1, then there is no evidence that the plaintiff has acquired any title to the ground appropriated by the defendants by adverse possession.

3. That a title to ground situate between high and low water mark on a navigable river, not included in the survey and patent of a contiguous riparian owner, and not owned by the Commonwealth, but by private individuals, cannot be acquired by adverse possession under the Statute of Limitations.

4. If the jury believe that the ground appropriated is situate in the manor of Pittsburgh, and has been made by accretions since the survey of the manor, the plaintiff has no title to the ground so made.

Plaintiff's counsel submitted the following points:—

1. That the defendants have shown no outstanding title to the landing in question in the original proprietaries of the manor of Pittsburgh, or their heirs.

2. That as against the said proprietaries, the plaintiff has shown title under the Statute of Limitations.

3. If the jury believe from the evidence that neither the original proprietaries of the manor of Pittsburgh, nor their heirs, have ever asserted title to the said landing, or questioned

[Borough of Birmingham *v.* Anderson.]

the title of the plaintiff, or those under whom she claims, and that no claim in their behalf for damages under the Act of 19th of April 1858, has been made; that at the date of said act, the plaintiff was in peaceable possession of said landing, enjoying the rents, issues, and profits thereof, and holding the same under the patent of the Commonwealth therefor of 16th April 1813: the borough of Birmingham cannot set up the alleged outstanding title of the said proprietaries, to defeat the plaintiff's claim for damages.

To which several propositions, the court (WILLIAMS, J.) answered as follows:—

"The first point of plaintiff is affirmed. It is shown by the certified copy of the survey of the manor of Pittsburgh, given in evidence by the defendants, and by the testimony of Nathaniel Patterson, that at the date of the said survey, the closing line of said survey, viz., 'from a marked red oak on the north side of the Monongahela river, thence across said river south seventy-eight degrees west, three hundred and eight perches, to the place of beginning,' was wholly within the Monongahela river, and that it did not touch the bank in front of plaintiff's property, or any portion of the tract called 'Ormsby Villa,' embraced in the survey and patent given in evidence by the plaintiff, and under which she claims title. If the bank of the river of the 'Ormsby Villa' tract has changed by gradual accretion, so that the bank now extends further into the Monongahela river, and encroaches upon the manor line as described in the original survey, the patentee and those claiming by purchase under and through him, would aquire title to all the land down to the line of the river, wherever that may be, and the defendants cannot set up the defence that the bank of the river in front of plaintiff's property has been so changed by accretion as to be within what was originally the manor line.

"It is not necessary to consider the other points submitted by the plaintiff, as the answer given to the first disposes of the whole question. The court declines to charge as requested on any of the points submitted by defendants' counsel, for the reasons suggested in the answer to the plaintiff's first point."

Under these instructions, there was a verdict and judgment for plaintiff, whereupon the defendant sued out this writ, and assigned for error the instruction of the court below in answer to the plaintiff's first point, and the refusal to charge as requested by the defendant.

*R. B. Carnahan,* for plaintiffs in error.

*Marcus W. Acheson,* for defendant in error.

The opinion of the court was delivered by

[Borough of Birmingham v. Anderson.]

READ, J.—Dr. Nathaniel Bedford, being the owner in fee simple of seventy-five acres of the Ormsby Villa survey, on the south bank of the Monongahela river, opposite Pittsburgh, laid out the town of Birmingham in the year 1811, which covered the whole of the northern end of this tract. He of course made a plan of his town, by which his lots were to be sold—and a copy of it, entitled a plan of the town of Birmingham, was placed on record in December 1811, in Deed Book R, vol. 17, page 412, but by whom does not appear, and it was cut out by Mr. Nixon, the recorder, in 1851 or 1852, and put in the Plan Book, vol. 1, page 4.

The description in the deed from John Ormsby to Dr. Bedford for this tract, which was dated 1st of December 1804, and recorded in recorder's office of Allegheny county, in Deed Book, vol. M, p. 365, was as follows:—"Beginning at a black oak stump on the bank of the river, and on the manor line, and running thence alone the same line south three degrees east, 200 perches, to a red oak, thence by land of Oliver Ormsby, north eighty-seven degrees east, 62 perches, to a post, thence by remaining part of same tract, north three degrees west, 211 perches, to a post on the bank of the river, and thence down the same, south seventy-seven degrees west, 63 perches, to the place of beginning." Whoever drew the plan on record must have had this deed in his possession, and if so, it must have come from Dr. Bedford, whose title paper it was, or we must resort to the improbable supposition, that the framer of the plan got a copy from the record without the knowledge of the Doctor, and forged the original of this paper.

The plan furnishes internal evidence of this. The line on the bank of the river, in the deed is seventy-seven degrees west, 63 perches; in the plan seventy-seven and a half degrees west, 63 perches; the southern line in the deed is north eighty-seven degrees east, 62 perches, to a post, whilst the parallel line on the plan is identical as to course and distance. The whole southern line is therefore 1023 feet. In the deed of Dr. Bedford to Wilkinson, of 16th of November 1811, it is described as " a lot in the town of Birmingham, on south side of Monongahela river, and marked in the general plan of said town No. 12, bounded by Ormsby street, by Virgin alley, and lots 3 and 13, containing in breadth on Virgin alley 60 feet, and in length on Ormsby street 95 feet." This is on the plan exactly as described here.

In the deed to Thomas Griffin, April 5th 1813, " Two certain contiguous lots marked in the plan of said town," (Birmingham) " Nos. 19 and 27, 120 feet in breadth, and in length or depth from Virgin alley to the beach of the Monongahela river, bounded by Ormsby street, Virgin alley, by lot No. 35, and by the beach

of the Monongahela river." These lots are in the plan as described here, and this conveyance recognises the *beach of the river* as laid down on it.

The deed to Rebecca Stephens, dated 5th April 1815, is for No. 10 in plan of said town—"bounded by Ormsby street, by the beach of the Monongahela river, and by lots Nos. 1 and 11, containing in breadth 60 feet, and in length or depth from lot No. 1 (should be 11) to the beach of the Monongahela river," corresponding exactly with the plan. And in the deed of Dr. Bedford to William Allison, dated 23d January 1817, for lot No. 43, he describes it as "extending to Water street, or the Monongahela river, bounded by Water street or said river"—showing the use of the designation of Water street found on the plan as early as that period, by the founder of the town, which he himself had planned and laid out.

We have, therefore, the breadth of the town on the plan, and by the other evidence we find some of the lots are certainly 60 feet in width, and by looking at the plan, we perceive that all the lines of the streets and lots are parallel from south to north, and that there are of course fourteen lots of 60 feet each from east to west, equal to 840 feet, and three streets of 60 feet each in width, or 180 feet, making together one thousand and twenty-three feet, being only three feet more than the 62 perches, a small variation in so large a plot, at so early a day, and in so rough a region as it then was.

In the Act of Assembly of the 19th April 1858, under which this controversy arose, the distance from Ormsby street eastwardly, to the eastern line of the town of Birmingham, is stated to be one hundred and twenty-one feet, the actual width of lots Nos. 1 and 10—which on the plan are 60 feet lots, and are, therefore, one hundred and twenty feet on their southern line.

We have, therefore, on the plan itself more than is to be found on Holmes' map or plan of the city of Philadelphia, for that has no names of streets, or courses, or distances, except by a rough scale of 528 feet, and a delineation of the points of the compass at the top. The first purchasers have their lots designated only by numbers, and the bank on the Delaware is left open east of the front street, which it is known was intended as a top-common from end to end, and yet this plan is the foundation of a great and populous city, and has always been received in evidence as well as the list of first purchasers, which contains only the name of each purchaser, and the number of his lot.

The present plan contains what we have already mentioned, and also the names of the streets, and of the square, all of which remain to the present day—Bedford Square having a market-house erected on it—and the plan corresponds with the lines on the ground, and the borough is connected with Pittsburgh by the

Birmingham Bridge, built at the foot of one of the streets designated on the plan.

It is clear from the evidence in this cause that the original of this plan is lost, and cannot be found—and that if this paper is not evidence, the holders of all the lots in this town plot are without any means of identifying their lots or their streets, because their deeds all refer to some general plan existing in 1811 when this paper was recorded. The plan is a title paper of the borough, and of every lot-holder, and the municipal authorities took the only course they could devise to establish its authenticity, by perpetuating the testimony of the person who drew the plan, and who is now dead. Fifty years have elapsed, and where is another living witness to be found?

The present suit arose under a claim for damages by the defendant in error, under the Act establishing a Public Wharf or landing in the borough of Birmingham, in the county of Allegheny, passed April 19th 1858, upon the ground that her four lots extended to the low water mark of the river. The plaintiff below claimed under a deed from Dr. Bedford to Patrick McKeag, dated 2d January 1812, after the recording of the plan for "five certain lots or pieces of ground, situate in the town on the south side of the Monongahela river, in St. Clair township, Allegheny county, marked in the general plan of said town Nos. 48, 55, 63, 71, and 105; said lots 49, 55, 63, and 71, lying contiguous to each other, and bounded by Denman street, Virgin alley, Grosvenor street, and the Monongahela river."

Now this whole conveyance depends upon the general plan. How are you to tell where Denman street, Virgin alley, and Grosvenor street are, their width and location, or whether it was No. 48 or 49, or where No. 105 was, except for the plan which is the very foundation of the plaintiff's title, and which must have been seen by the grantee before his deed was executed? No. 48 is on Denman and Carson streets, at the south end of the town, and No. 105 is on Bingham street, and could not be identified at all except for the plan. The plan is, therefore, an essential muniment of the title of the defendant in error, and she could not proceed a step without it.

Under these circumstances the defendants below offered this plan in evidence, in connection with the testimony of John O'Hern, taken in pursuance of a bill to perpetuate his testimony in No. 108 March Term 1847, in the Court of Common Pleas, with further evidence that this had been a recognised plan of the town of Birmingham for fifty years. If O'Hern's testimony was admitted, it proved the plan to be a copy, and of course the plan must have been admitted also, as the original was lost or mislaid. The court rejected both, after examining further testimony; the record of the plan was offered again, and it was again rejected.

4 Wr.—33

[Borough of Birmingham *v.* Anderson.]

It is clear that there was a plan made by direction of Dr. Bedford, upon which the whole title of his intended town was to depend, for he sold by its numbers, and his vendees, particularly Mr. McKeag, purchased by them. All, therefore, had notice, and must have seen his plan somewhere. No doubt some one said, Doctor, put this plan on record; it is a necessary part of our title. We have seen already that this copy, in the first place, corresponds with the survey on the ground, and that it is accurate; and as it is conceded there was a plan, where could it come from except from Dr. Bedford, and could it or its original have been made by any one who had not the possession of his title-deed from Ormsby?

The natural presumption, therefore, is, that it was placed on record by Dr. Bedford, and if so it was competent evidence, and should have been admitted by the court. This plan is fifty years old, made and put on record in the year the town was laid out, and is clearly, with the work on the ground, the work of a surveyor who understood his business.

In connection with this plan was offered the testimony of John O'Hern, taken on the 1st of April 1847, on a bill to perpetuate testimony on the part of the borough of Birmingham, in the Court of Common Pleas of Allegheny county, with further evidence that this had been a recognised plan of the town of Birmingham for fifty years.

The witness was a surveyor, and is now dead, and every owner of property was interested in establishing what turned out, after the strictest search for many years past, to be the only paper which can be found purporting either to be the original plan or a copy of it. When, therefore, the bill was filed by the borough, there was no individual whose interest it was to oppose the action of the municipal authorities, for it was an essential muniment of title of every lotholder and citizen of the borough, and, therefore, there was no person against whom the bill could be brought unless they had made defendants the whole population of the town, who were no doubt in favour of their action. If any one had been selected but Mrs. Anderson, according to the present argument, it would not have been evidence against her. Suppose that this plan had been that of a populous city of 100,000 or 600,000 souls, against whom should such a bill be brought? for certainly if there is but one living witness who can prove its plan, there must be some mode of perpetuating his testimony. A city cannot be remediless, simply because it is so large that it is impossible to make all its inhabitants' defendants, and therefore you must resort to the only practicable method adopted in this case.

But the declarations of a deceased surveyor, in relation to lines run and plans made from actual survey, are clearly evidence in

[Borough of Birmingham *v.* Anderson.]

an instance like the present, which concerns a matter of general if not public interest. It is of no consequence whether such declarations were under oath or not, on a bill to perpetuate testimony, or on the trial of a cause between other parties. It is within a well known and well defined exception to hearsay testimony.

Judgment reversed, and *venire de novo* awarded.