# Pittsburgh, Appellant, v. Edwin Bell & Sons Co.

*Deed—Boundaries—Reference to plan—Evidence.*

1. Where a deed specifies with particularity the courses, distances and boundaries of a lot of ground, and also refers to a plan upon which this and other lots appear, it will be presumed, in the absence of evidence to the contrary, that the plan, if produced, would show the lot had the courses, distances and boundaries specified in the deed.

2. Plans drawn for the purpose of showing what may be the effect of future municipal action in widening a street, cannot overthrow a specific description in the deed of a property abutting on the street, in the absence of evidence that the lines appearing on the plan were taken from the deed, or from an earlier plan by which the property was sold.

*Railroads—Street—Occupancy of street—Dedication — Acceptance.*

3. Ordinances of a municipality authorizing a railroad company to occupy a street, amount to an acceptance of its prior dedication to the public.

*Deed—Boundaries—River—Low watermark.*

4. Presumptively a deed of property bounded by a river, carries the grantee's title to low watermark, subject only to the public's right of navigation between high and low watermarks.

*Municipalities—Eminent domain—Damages—Constitutional law —Due process of law.*

5. Under article IX, section 10, of the Constitution of 1790, article IX, section 10, of the Constitution of 1838, and article I, section 10, of the Constitution of 1874, a municipality cannot take a property without making compensation for it, or entering security for payment of its value, when this is determined.

6. Due process of law requires that property owners shall be given a fair opportunity to submit to a judicial tribunal for its determination the right of a municipality to take their property, and the amount of damages which are to be paid in case it is taken.

*Adverse use—Prescriptive right—Evidence—Permissive use.*

7. A prescriptive right can arise only by satisfactory proof of an open, notorious and long-continued adverse use.

8. An owner may suffer a permissive use of his property by the public, in conjunction with himself, without in any degree impairing his right to determine such privilege at any time.

*Evidence—Witnesses—Weight to be given evidence—Trial judge.*

9. A trial judge, who sees the witnesses, is best qualified to determine what weight should be given to their testimony.

*Appeals—Findings of fact.*

10. An appellate court will not reverse the findings of fact of the court below unless clear error is shown.

Argued February 27, 1923. Appeal, No. 141, Oct. T., 1922, by plaintiff, from decree of C. P. Allegheny Co., Oct. T., 1913, No. 718, dismissing bill in equity, in case of Pittsburgh v. Edwin Bell & Sons Co. Before FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Bill for injunction. Before CARPENTER, J.
The opinion of the Supreme Court states the facts.
Bill dismissed. Plaintiff appealed.

*Error assigned,* inter alia, was decree, quoting it.

*Richard W. Martin,* City Solicitor, with him *Sara M. Soffel* and *Harry M. Irons,* Assistant City Solicitors, for appellant.—The conveyances by the Greggs of lots in the plan of Sidneyville, by reference to the lot plan showing this open space, were contracts with the purchasers not only granting the right of way or use of said open space to them, but also for the public use: Pittsburgh v. Epping-Carpenter Co., 194 Pa. 318, 322; Birmingham Borough v. Anderson, 40 Pa. 506.

The dedication by the Greggs, in their plan of Sidneyville, of Water Street, a public highway along the bank of the Monongahela River, a navigable stream, operated as a dedication of the land lying between the northern

boundary thereof and the low watermark of the Monongahela River, even though the wharf itself were not actually dedicated by said plan: Com. v. McDonald, 16 S. & R. 390; Birmingham v. Anderson, 48 Pa. 253; Pittsburgh v. Epping-Carpenter Co., 194 Pa. 318; Re United States, 174 U. S. 196.

In the absence of any evidence of actual dedication of either Water Street or the wharf lying north thereof, the City of Pittsburgh as the successor of the Borough of Birmingham has shown a right to the use thereof by prescription, based upon continuous and uninterrupted user for a long period of years: Waters v. Phila., 208 Pa. 189; Godino v. Kane, 26 Pa. Superior Ct. 596.

*J. Rogers McCreery,* of *McCreery & Wolf,* with him *Henry Oliver Evans* and *Reed, Smith, Shaw & McClay,* for appellee.—The title to land cannot be acquired or established by unofficial diagrams, drafts and surveys. But such papers may often be extremely useful in fixing and designating doubtful boundaries. It has been an ancient custom of the courts to receive them in evidence for what they are worth, in illustrating a question of boundary: Sweigert v. Richards, 8 Pa. 436, 438; Mineral R. R. Co. v. Auten, 188 Pa. 568.

The case is governed by Banks v. Ogden, 2 Wallace 57.

Opinion by Mr. Justice Simpson, April 9, 1923:

In its bill in equity in this case, the City of Pittsburgh alleges defendant wrongfully took possession of and erected buildings on a tract of land located along the Monongahela River (an interstate navigable highway), between 16th and 17th streets, in what was formerly part of the Borough of Birmingham, which in 1872 was consolidated with the city; it prayed a mandatory injunction to compel a removal of the buildings, and a perpetual injunction forbidding defendant to thereafter use the property. An answer was filed denying the city's right, but not challenging the jurisdiction of equity; in

due course a final decree was entered dismissing the bill, and from this the city now appeals.

So far as it is important to be considered here, the title to the land in dispute starts with a deed made December 1, 1804, by John Ormsby to Isaac Gregg and Sidney, his wife, for a tract of fifty acres of land fronting on the river. Their title, of course, extended to low watermark, subject only to the public's right of navigation between this and high watermark.

On October 30, 1811, the Greggs conveyed two adjoining pieces of ground, part of said tract, one to Thomas Bell and the other to John Nicholson. It is admitted that, except as regards the location, the descriptions are alike, and hence it is only necessary to quote the first of the two, which is a grant of "A certain lot or piece of ground No. 1 in Sidneyville, in the Township of St. Clair and County of Allegheny, bounded and described as follows, to wit: Beginning at low watermark on the south side of the Monongahela River......[thence by various courses and distances back] to low watermark, on the aforesaid river, and thence up said river 8.05 perches to the place of beginning. Bounded on the east by lands belonging to the heirs of John Ormsby, on the south by lot No. 8, on the west by lot No. 2, and on the north by the Monongahela River, [and] containing one acre, with the reduction of a street of thirty feet......The above described lot or piece of ground is bounded and begins on the top of the river bank at a post and by a line running along the said bank......And the said Isaac Gregg, and Sidney, his wife, only convey away what right and title they may have to the ground between the bank and low watermark."

With but a slight verbal change, we agree with the city that this grant operated as "a conveyance of land by general warranty deed, embracing the [land down to high watermark, and as a] quitclaim deed for any right and title the Greggs had to the ground between [it] ......and the low watermark." We also agree that the

words "No. 1," "Lot No. 2," and "Lot No. 8," show there was a plan of Sidneyville; but since it was not recorded or produced, nor, so far as affects the present issue, any direct evidence of its contents given, we must presume that the courses, distances and boundaries, set forth in the deeds with such particularity, are in accordance with that plan; and this presumption cannot be overthrown, as is attempted in this case, by an argument founded on plans made by other people, from twenty to forty years after the deeds, not for the purpose of setting forth the existing status, but what it would be if the borough succeeded in changing the street from thirty feet wide to either one hundred feet or one hundred and fifty feet in width.

Inasmuch as the deeds do not state where the thirty-feet-wide street (later called Water Street), referred to in them, was or was to be, it became important to establish this necessary fact aliunde; and since, by reason of the great lapse of time, death had removed all the witnesses, who could have testified regarding the plan and the location of the street on the ground,—if it was located,—the city, which had the burden of proof,—since it was endeavoring to take from defendant a property in its possession,—was compelled to produce such documentary and other written evidence, on the subject, as it could find, and, failing in thus establishing a title, to prove a prescriptive right.

In considering the plans produced, it must be steadily borne in mind that, for the reason already stated, it is a matter of indifference what they purport to show as to the lines of the lots, the only open question being whether the city has established a right to the land in dispute, which is between the street and low watermark of the river. In part of its argument the city has assumed that the street was at the edge of high watermark, and has elaborately contended that the result of this was that all riparian rights were in the public and all accretions became vested in it. It is not necessary to consider

whether or not the rule of law invoked could properly be applied to a case like the present, where the lot owners' deeds expressly gave them title to low watermark, for there is no evidence that Water Street was so located. Nor is there now any dispute as to its exact position; for more than thirty years it has been fixed as at a given place, and, by ordinances of the city (which amount to an acceptance of its dedication: McKee v. Penna. R. R. Co., 255 Pa. 560), has been occupied by the Pittsburgh & Lake Erie R. R. Co., and the Pittsburgh & White Hall R. R. Co.

The limitation of the controversy, as thus stated, renders it unnecessary to consider at length the documentary evidence produced. Turning first to the plans, we find that the earliest in point of time is the Barbeau Plan, dated January 27, 1831, which does not show any street, but only an open space along the river, without any designation regarding its ownership. The next is the Remington Plan, made February 24, 1837, for official use in the opening of Perry Street. It shows a thirty feet wide street, "laid out by I. Gregg," paralleling the river, but at some distance from it, and defendant's property lines crossing the street and the tract beyond it, and running to the river. It is signed by the surveyor and the road jury, who were, we are told, thoroughly acquainted with the locality. The third is dated March 14, 1839, and was made by some unknown person for the purpose of showing the effect of plotting a street "100 feet plus [in width] to low watermark," parallel with and skirting the river; the fourth, dated September 16, 1848, and made by R. E. McGowin, discloses what would have resulted from the laying out of a street along the river "150 ft. wide more or less to low watermark"; and the fifth, also by Mr. McGowin, dated April 5, 1851, is in some respects like the fourth, its only additional purpose apparently being to designate the encroachment of the river at that time, and not to fix the actual line of the street, or the then ownership of the land between it

and the river. Finally, the Patterson Plan of October, 1872, prepared "in pursuance of the ordinance passed October 3, 1872," shows the street as paralleling the river, not even adjoining its high watermark, but with the side lines of the property carried across the intervening tract between the street and the river.

None of these plans indicates that the street actually ran along high watermark, and none of them shows that the city had any title to the ground in dispute, or to any other ground in like situation. Several of them disclose a wish on the part of the borough to have the land, but this very fact points to the conclusion that defendant's record title had never actually been divested.

There were numerous acts of assembly and ordinances offered in evidence, amply showing a desire of the borough to get the property, but never an actual taking of it. We need not review them at length, since they do not express any ownership of the borough or city, and, with one exception hereafter noted, do not disclose any attempt to comply with article IX, section 10, of the Constitution of 1790, article IX, section 10, of the Constitution of 1838, or article I, section 10, of the Constitution of 1874, each of which stood in the way of a taking, except upon entering security or making compensation for the land taken, or giving the lot owners an occasion, by judicial proceedings, to have their damages assessed. The 14th Amendment to the Constitution of the United States provides, inter alia, "nor shall any state deprive any person of......property, without due process of law," and this cannot be obeyed unless the owners shall have been given "a fair opportunity for submitting the issue to a judicial tribunal for determination": Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287. So far as appears by the present record there was no attempt to comply with that constitutional requirement, save in one instance where, pending the assessment of damages, the Act of March 13, 1849, P. L. 159, rendered nugatory the attempt of the borough to take the

property now in dispute, under an ordinance dated August 13, 1848.

These acts and ordinances disclose, however, certain facts which indicate that the city's present contention is entirely an afterthought. For instance, the Act of March 28, 1836, P. L. 204, authorizing the opening of Perry Street through defendant's property (and under which the borough did open it, as shown on the Remington Plan hereinbefore referred to), avers this property was bounded by the Monongahela River and not by Water Street. By an ordinance of the borough, dated May 28, 1856, it is recited that "Isaac Gregg, former proprietor......dedicated a portion of the ground along the bank of the Monongahela River for a public street, which said street so dedicated has not been located, or the boundaries thereof properly defined," and then provided for the opening of Water Street, forty feet wide, at some distance from the river, and ordains that all of the ground between the street and the river "shall be improved and occupied as a public wharf or landing." It is found and not denied, that at this time the borough had no statutory authority to take ground for a "public wharf or landing," and "there is no evidence that Water Street, as located by the ordinance of 1856, was ever opened or improved." From this ordinance two things are evident, both telling against the city: (1) At this date the street was not supposed to run to the river; and, (2) The borough did not then claim the space between the street and the river had theretofore been dedicated to a public use.

So, also, the judicial proceedings proven, so far as relevant, antagonize the city's contention. When the borough undertook to appropriate this property under an ordinance dated August 13, 1848 (in connection with which the McGowin Plan of September 16, 1848, above referred to, was prepared), defendant's predecessor in title filed a petition alleging he was the owner of the plot now in dispute, and applied for a jury of view. His

ownership was not challenged and he was awarded damages; but, pending his appeal alleging inadequacy of amount, the whole proceedings were overthrown, as already stated, by the Act of March 13, 1849, P. L. 159, which forbade the taking. So, also, in 1864, when the borough brought suit against one Ihmsen the owner of a plot similar to defendant's, upon advice of its counsel, R. B. Carnahan, Esq., it discontinued the suit, because "the deeds called for low watermark and there is no dedication, so far as known, of said ground as a public highway by Mr. Gregg in laying out the plan of Sidneyville." This is particularly significant since Mr. Carnahan was also counsel for the borough, and only a short time before won the appeals in, Borough of Birmingham v. Anderson, 40 Pa. 506, and Same v. Same, 48 Pa. 253, upon which appellants greatly rely in the instant case; the distinction between those cases and this being that there the property lines ran only to "the beach of the river . . . . . . [and] were bounded by it and not by the river, to which they did not extend" (48 Pa. 259) ; whereas here, as is pointed out, the deeds call for low watermark of the river.

Enough has been said to show the documentary evidence does not require us to reverse the decree of the court below, and hence we turn to the city's final contention that the uncontradicted testimony shows a prescriptive right by adverse user.

It is conceded there was ample evidence of the existence of a street or road, commonly known as Water Street, which was maintained by the property owners and not by the public, sometimes used by the latter but principally by the former, and for more than thirty years, as already stated, occupied by the Pittsburgh & Lake Erie R. R. Co., and the Pittsburgh & White Hall R. R. Co., to the exclusion of the public.

There was also evidence of lumber, etc., being taken from boats on the river and hauled across the plot between Water Street and the river, but it shows only vague statements regarding the ground in dispute. All

of this testimony was produced by the city, and so far as it is clear, it relates to the river front between 10th and 16th streets, and not to the land in dispute between 16th and 17th streets, as will be made plain by a few sample quotations from it. The witnesses alleged that materials could have been hauled up to 17th Street if "they wanted to" do so; "they hauled some things up there"; "it was used, I am certain, from at least 11th Street up to 15th— to 16th Street—perhaps 17th"; the road extended "as far as 15th" Street, "I think there was boats landed there"; "above 15th or 16th street......I don't think there were any rafts taken out"; "the beach in general [was used] from 15th and 16th down," the materials "were landed at 15th and 13th"; the hauling across the open space would be "from 15th to 16th, and then they got into 16th Street"; the unloading was done "generally between 13th and 15th," usually from "16th down to 12th."

Since a prescriptive right can arise only by satisfactory proof of an adverse use, open, notorious and long continued, we cannot say the court below erred in its finding that "the weight of evidence sustains defendant's contention that the beach was not in general use by the public above 16th Street."

"An owner may suffer a permissive use by the public for all purposes of passage, jointly with himself, without in any degree impairing his right to terminate such privilege at any time" (Weiss v. Borough of South Bethlehem, 136 Pa. 294) ; hence, since the controlling facts upon this point were attempted to be established by parol, the weight to be given to the testimony was for the trial judge: Duffey v. Jennings, 247 Pa. 388; Gongaware's Est., 265 Pa. 512. This being so, the usual rule applies that we will not reverse findings of fact except where there is clear error (Cruzan v. Cruzan, 243 Pa. 165; McIlvaine v. Powers, 270 Pa. 341), which in the instant case we do not discover.

The decree of the court below is affirmed and the appeal is dismissed at the cost of appellant.